MEMORANDUM OF DECISION
On November 23, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Terrianne D. and Brian D. to their daughter, Shannon. The termination petition alleges that both parents have failed to rehabilitate, so that they could parent their daughter and that they have no ongoing parent child relationship with her. Connecticut General Statutes § 17a-112(j)(3)(B) and (D). The petition also alleges that DCF has made reasonable efforts to reunify the parents with the child.
On January 10, 2001, the respondent mother filed a motion to dismiss, arguing that the statute, as interpreted by Quanitra M., 60 Conn. App. 96, CT Page 11148 ___ A.2d ___, cert. den. 255 Conn. 903 (2000) violates her rights to due process under the United States Constitution and the Connecticut Constitution. The respondent father joined the mother in claiming that the statute was unconstitutional, both on its face and as applied to these parents. Trial took place on January 5, 10 and 11, March 14, 15 and 16 and arguments on the motion to dismiss concluded the matter on May 11, 2001. Counsel as well as the guardian ad litem for the minor child, Shannon, supported the termination of parental rights petition. On July 13, 2001, both parents filed motions to reopen the matter and to present new dispositional evidence. The motions were heard and granted on August 7, 2001, at which time, after brief additional testimony from the guardian ad litem and certain factual stipulations, the trial concluded. On August 7, 2001, both counsel and the guardian ad litem for Shannon had changed their positions and supported denial of the termination petition.
Both parents vigorously contested the DCF claims and the termination petition. For the reasons set forth in detail below, the court denies the motion to dismiss and finds that the statute is constitutional on its face. The court does not reach the issue of whether the statute is unconstitutional as applied to these parents because of the court's conclusion that the reasonableness of DCF's efforts toward reunification were not proven by clear and convincing evidence. Due to the facts found and for the reasons set forth below, the court dismisses the termination petition on both statutory grounds and orders the specific relief set forth in its orders.
 A. MOTION TO DISMISS
The respondent mother claims that because In re Quanitra M., supra, held that the seven written findings the court must make pursuant to Connecticut General Statutes § 17a-112 (e) need not be proven by clear and convincing evidence prior to the court's best interest determination, that the statute is void for vagueness. Specifically, she argues that because there is no clear guidance on what "best interests" means, in the context of the dispositional phase of a termination of parental rights petition, the statute cannot be upheld on constitutional due process grounds.
The court notes that mother's argument fails to consider or explain in any detail why the seven written findings, whether found by clear and convincing evidence or not, would define "best interests" completely only if the "clear and convincing" standard of proof applied. The first two findings relate to mandated DCF efforts and not directly to any "best interests" finding.[2] The second finding must have been proven by clear and convincing evidence prior to the court's addressing the CT Page 11149 adjudicatory issues. In addition, the third finding is directed to court orders and compliance with the terms of such orders, the fifth merely recites the age of the child and the seventh whether the parent has been prevented from maintaining a relationship with the child.[3] In other words, five out of the seven factors on which mother would have relied, had the Appellate Court required them to be proven by clear and convincing evidence, require tasks which do not have any particular direct bearing on what is best for the child. These findings do have a bearing on whether or not the adjudicatory grounds can constitutionally be found. Thus, the court is not persuaded that the bright legal line in the sand that mother seeks to draw even exists, upon closer review of the statute as well as the details and specific content of the seven mandatory written findings. Nonetheless, Connecticut law is clear on the subject of what it means for a statute to be void for vagueness.
 "The doctrine requires statutes to provide fair notice of the conduct to which they pertain and to establish minimum guidelines to govern law enforcement. The United States Supreme Court has set forth standards for evaluating vagueness. "First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." Grayned v. Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). "[A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." Baggett v. Bullitt, 377 U.S. 360, 367, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); see also State v. Schriver, 207 Conn. 456, 459, 542 A.2d 686
(1988); State v. Cavallo, 200 Conn. 664, 670, 513 A.2d 646
(1986). State v. Indrisano, 228 Conn. 795, 802. 640 A.2d 986 (1994). (emphasis added).
Further, the court is persuaded by the reasoning of In the Interests ofAngel B., Superior Court for Juvenile Matters at New Haven, Docket No. NO5-CP98-001048-A, May 8, 2001 (Conway, J.) that the "`best interests of the child' phrase has been subjected to judicial scrutiny in a plethora of juvenile and family cases." Our Supreme Court found that:
 "Conducting a best interest analysis is not a narrow concept restricted to a compelling reason or to fully reuniting the parent with the child. Rather, it is CT Page 11150 purposefully broad to enable the trial court to exercise its discretion based on a host of considerations." In re Bruce R., 234 Conn. 196, 206, 662 A.2d 107 (2001)
More recently, the Appellate court has stated "([t]he trial court is vested with broad discretion in determining what is in a child's best interests." In re Alissa N., 56 Conn. App. 555, 559, 742 A.2d 415
(1999). The Appellate court in In re Alexander C., 60 Conn. App. 555,559, ___ A.2d ___ (2000), a recent juvenile matter case involving the probate transfer of guardianship statute and its required best interests determination, quoted the eloquent words of Justice Peters from a family law case with approval.
 "The primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well being and in the continuity and stability of its environment." Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 906 (1985).
Based on all of the foregoing, the court concludes that there is significant guidance available as to the meaning of the phrase "the best interest of the child." The court holds that the statute on its face is not void for vagueness.
The second claim advanced by the respondent mother is that the statute is void for vagueness as applied to these parents. The court does not reach this issue because of its findings concerning the reunification efforts required to be made, which were not proven by clear and convincing evidence. In addition, there were no claims either briefed or raised as to the State Constitutional argument. Therefore, the court considers it abandoned.
 B. FACTS
From the evidence presented, the court finds the following facts:
1. Brian D., the father of Shannon
 A. Events prior to the Order of Temporary Custody
Brian is now forty-three years old and he is the father of the youngest two children born to Terrianne D., his wife. Brian has a lengthy criminal record arising from his long years of drug and alcohol abuse. He is a convicted felon. The court notes that in seeking treatment some six years ago, he reported a twenty-year history of alcohol abuse, a three-year CT Page 11151 history of cocaine abuse and a ten-year history of Valium abuse.[4] As such, he is a long term, chronic poly-substance abuser.
In late 1996 and early 1997, he was separated from Terrianne, whom he had married eight years earlier, in May, 1989. In late 1996 and early 1997, his two children, Brian, Jr. and Shannon, were in the care of their mother, who also has a history of addiction and substance abuse. Brian was then himself in a drug treatment program, which had been court-ordered. He left that program in March, 1997 in order to care for his children. At that point, the children were temporarily in the care of a family friend after Terrianne had failed to come home one evening. Their twelve-year-old half-sister, Jennifer, had been caring for them in her mother's absence and had brought them to the home of Irene P., the family friend. Because Irene could not keep the children for any length of time, she and Brian determined that it would be best to call DCF. Brian knew he was required to begin serving a six-month prison term and so was not available to care for his children. DFC [DCF] was contacted Ion March 26, 1997 and on April 2, 1997, after securing an order of temporary custody, Shannon and Brian, Jr. were placed in the care of Jennifer's paternal aunt and her husband with their father's approval, where Shannon has remained ever since.
Irene P. testified about the early events in the case. She stated that she cared for Brian Jr. and Shannon for about a week before she and Brian called DCF. "At that time," she stated "no one knew where Terrianne was" and she could not have cared for the children for six months, until their father was released from incarceration. She stated that Shannon, in her opinion, was a normal little baby. She stated that "Shannon was shy amongst people she did not know." She noted that one time her oldest daughter, a person Shannon did not know, came to the house. She stated that Shannon "cried for a couple of minutes and then she went straight to my daughter after fifteen minutes." She herself had seen Shannon at least every other week from the time Shannon was born until she went into foster care. She also testified that she saw no evidence of any mistreatment or delays in the child's development.
In response to questions about Shannon's medical condition, she stated that in her opinion, Shannon had no pressing medical issues at that time. "She was just growing hair, it was very fair and you did not see a lot of it unless it was wet." She noted that on one of the days that she had the child, Shannon had diarrhea, but that she ate food and drank milk. She repeated several times that Shannon was teething. She testified that she had known Brian and his wife for about seven or eight years and Brian himself for about fifteen years. She stated: "we had quite a bond, Shannon and I, since the day she was born." She noted that she continues to have contact with the children's father, but has not seen Shannon CT Page 11152 since she went into foster care.
Shannon's foster father, Fred S., testified. He noted that when Shannon came into his home, she appeared frail and her color was not good. She was not very "responsive and did not cotton to me very well." He described her "stranger phobia" and noted that it took quite a while before Shannon became comfortable with him. He testified that it was "the male members of the family that Shannon was having problems with, someone she did not know. She did not react that way to the females in the house." He noted that this also happened when she was taken outside the home. As to her general state, Mr. S. testified that Shannon "appeared to be a normal one-year-old, she crawled around, she was not walking yet." He noted that she "watched the activities of the other children in the home." After a period of time, a year or eighteen months, he noted that her difficulties with strangers were less severe.
Shannon's foster mother, Dawn S., however, has painted a somewhat different picture to the psychologist evaluator who evaluated both Shannon and her brother, the biological parents and received information from the foster parents. To Dr. Berkowitz, she stated that Shannon was:
 `"completely lifeless. No spark to her. No hair on her body — no eyebrows or eyelashes. Malnutrition, according to the doctor. She would only take a bottle,; never introduced to real food. Just like a newborn . . . Underweight by five pounds. . . . She was severely dehydrated from a fever and diarrhea She was in really rough shape when we first got her and brought her to the doctor. Pathetic and homely-looking."'[5]
Dr. Berkowitz in her report noted the discrepancies in the reports about Shannon's condition at the time of the removal. In her italicized comments in the reports (her method of noting "asides" or commentary on the interview as it is unfolding), Dr. Berkowitz writes:
 "Given the foster mother's account of the child's health, it would be surprising if one or two days of illness could have led to such serious malnutrition and endangerment. It would be suggested a report from the pediatrician be obtained, to verify one or the other account. If Mrs. S. is exaggerating for her own purposes, this would be of concern."[6]
Dr. Berkowitz also noted in her report a puzzling concern about Dawn S., who expressed worry about her future contact with Terrianne in the office CT Page 11153 waiting room and Dawn's reports to the DCF social worker then involved in the matter.
Mrs. S. did not testify at trial. Some months after the children's placement in her home, she took Shannon to a pediatrician, who reportedly noted some developmental delays in Shannon. As a result, DCF made a referral for Shannon to receive birth to three services in April, 1998, a year after her placement in foster care. The DCF social worker on the case at the time of placement and until September, 1998, reported that DCF did not offer any visitation to the parents because of the recommendations of the counselors in the program. She testified to her observation of the stranger anxiety that the child exhibited towards her right through to the end of her time on the case, noting that she visited once a month during that year and a half.[7]
DCF did not take Shannon to a pediatrician at the time of placement to have her medically checked, something that DCF often does if a child's condition upon removal seems to warrant this level of concern. From this, a picture of Shannon taken shortly before her removal, the testimony of Irene P., a pediatrician's report completed some two months prior to Shannon's removal from her mother[8] as well as Terrianne's report of Shannon's behavior, the court concludes that Dawn S. has exaggerated the circumstances surrounding the child's condition at the time she was taken from her mother's care.
What is evident from the record is an ongoing and unfortunate level of hostility between Dawn S. and Terrianne D., whose oldest child, Jennifer, is the daughter of Dawn's brother. This hostility apparently has its roots in the past history of Dawn and Terrianne concerning Jennifer's care. Jennifer was placed with Dawn and Fred S., her paternal aunt and uncle, for about eighteen months during her early childhood years, after which she was returned to her mother who moved to Maine with Jennifer. In 1997, Jennifer's guardianship was transferred to her grandparents, with whom she now resides. The hostility has continued between the foster mother and the biological parents, even though Fred S. has tried to assist in minimizing the conflict.
B. Post-Neglect Petition Events
The children were adjudicated neglected in May, 1997 and their commitments to DCF have been extended since that time. Most recently, Shannon's commitment was extended on April 2, 2001 until May 2, 2002. After the first adjudication and in the first six months of the children's placement with Mr. and Mrs. S., Brian did not have visits with them. He believed that Shannon was too young to be brought for visitation to a prison environment. He testified that he did not want visits with CT Page 11154 his son while he was incarcerated. "I did not want him to see me in a negative light. I thought this was best for them for a relatively short period of time." He noted that he knew it would cause a breach but hoped that he could get through this and "repair the breach."
Brian, Jr. had once before been removed from his and Terrianne's care in 1994. During that year, Brian Jr. had been adjudicated a neglected child and committed to the care and custody of DCF on September 9, 1994. Nonetheless, as both parents appeared to be doing well the following year, Brian, Jr. returned home on March 31, 1995 and his commitment was revoked on June 29, 1995.
In all, he managed to stay in the care of his parents for just two years before his second removal. On March 16, 2001, the testimony was that Brian, Jr. was involved in intensive reunification efforts with his father and the termination petition originally filed in 1999 when Shannon's was filed had been withdrawn. It was expected then that he would be reunified with his father shortly. In addition, therapeutic contact had begun between Brian and his mother. Later testimony on August 7, 2001 would prove that the plan was successful.
It was not until December, 1997 that visitation between Brian, Jr. and his father began. They continued to have visits until July, 1998, after which point they ended. By December, 1998, they had again resumed and have now continued without interruption. Until the decision was reached to file the termination petitions in 1999, it had been DCF's plan to reunite Brian with his parents. Over time, visitation between them expanded to include not only therapeutic supervised visitation, but also unsupervised time between Brian and his son. Further, the plan for Shannon was that when the process of reunification between Brian and his father was well underway, visits would begin with Shannon. While there were initially some difficulties with visitation and Brian's response to contact with his father as well as with Brian, Jr.'s supportive therapy, over a period of time and with a new counselor for the child, those problems were overcome.[9]
DCF and the court have accepted that Brian Sr. had rehabilitated to the point where Brian Jr. could be returned to his care. By August 7, 2001, Brian had been successfully reunified with both of his parents and was residing in their home. He had been placed under an order of protective supervision due to expire on October 14, 2001. All reports indicate a remarkable reunification with both of his parents.
Nonetheless, visitation with Shannon has never been permitted for either of her biological parents.[10] As noted by the first social worker assigned to the case in 1997, DCF's decision not to offer CT Page 11155 visitation with Shannon was not related to Brian. Sr.'s parenting deficiencies, but was due to Shannon's own developmental delays and her "stranger anxiety." It is unexplained why DCF could not have provided therapeutic visitation between Brian and Shannon to assist her in overcoming her "stranger anxiety," particularly if she had visited her father together with her brother, to whom she was closely attached.
Brian, Sr. began living in a Christian halfway house in October 1997, upon his release from incarceration. In late 1997 and 1998, his course of progress was that of a typical substance abuser with some steps forward and many steps backwards, as it had been during earlier such periods in his life. In January, 1999, Brian was arrested for issuing a bad check and larceny in the sixth degree. It was during this time that he admits he last used drugs and drank. He states that he has been sober for over two years and there is no evidence to the contrary. The last random urine sample taken showing the presence of drugs was in March, 1999. Brian has had no criminal involvement since that date. The court credits his testimony and finds that his sobriety is now of over two years in length.
Brian has been gainfully employed in the years since his release from incarceration. He continues with his committed Christian life-style and testified how important his beliefs have been for his recovery. The court finds that as of the last day of the presentation of evidence in this matter, August 7, 2001, Brian, Sr. had rehabilitated himself so that he could parent his son Brian, Jr., who will be twelve years old in September.
In the pending case with his daughter, Shannon, the court issued and Brian received expectations to complete so that Shannon could be returned to him.[11] Those steps included attending parenting, individual, family and drug and alcohol counseling. They required Brian to maintain adequate housing and income, not to engage in any substance abuse and to have no involvement with the criminal justice system.[12] He had met many of the expectations[13] as of the time of the filing of the termination petition in November, 1999 and he has continued to adhere to them since that time.
The court has noted that the determination was made by DCF and others to prohibit visitation between Brian and his daughter Shannon. Brian testified that he, with the advice of counsel, accepted this because of the plan to reunify him with Brian, and when that was successful, to begin with Shannon. As noted, once the rehabilitation process was adequately advanced so that it appeared Brian and his father could reconnect, DCF decided to adopt the radically opposed course of action with Shannon. The decision was made to withdraw Brian's termination CT Page 11156 petition and to sever the petition pending for Shannon from Brian's case and to proceed to termination with Shannon.
Brian testified that he wanted to have his whole family together again. When questioned about the impact that this would have on Shannon. he spoke of the importance of the biological connection between them as well as Shannon's ties to Brian. He believed that he could be Shannon's father again and stated that he had not been given a fair chance in the years since her removal.
C. The Psychological Assessments and Evaluations
In October, 1998, Dr. David Mantell, by court order, psychologically evaluated the children and the parents. He saw Brian and his son together and then Brian with Shannon. Because of the limitations in the court order, he did not see Terrianne with Shannon or Brian. In his report, he repeats that Dawn S. provided him much of the same information she provided Dr. Berkowitz, which the court, based on the testimony, has concluded is in part inaccurate and exaggerated. In the case of Shannon, Dr. Mantell used in his evaluation procedures the Connecticut Infant-Toddler Development Assessment program, the Child Development Inventory and the Child Behavior Checklist. In his summary, he notes that:
 "9. Because of their long term histories of substance abuse and legal involvement, the parents have not been able to discharge normal range child care responsibility. Each parent has been out of the children's lives for extended periods. This has been the near totality of the life of the youngest child, Shannon, and has extended for years in the case of the older child, Brian."[14]
Dr. Mantell continued in his report to observe that "[b]ecause of the clinical complications with the children, particularly Brian, the issue of visitation is quite complex." He recommended that both children should receive further evaluation and stated "[b]oth child psychiatric and psychological expertise will be required." He noted that "Shannon needs to be seen for further evaluation of her aggressive behavior and attachment difficulty." While he noted the strong attachment Brian, Jr. had to his father, Dr. Mantell also observed that he did not see the point of initiating visitation by Shannon with either parent unless there is a firm plan for reconciliation of the child with either or both of them."
Dr. Mantell testified at trial that his conclusions in 1998 about visitation between the parents and Shannon were based on three factors, CT Page 11157 all of which were equally important. The first was Shannon's age. He noted that she had been in care at that time for about a year and had been removed from her mother at eleven months. He saw Shannon as at a critical stage. He noted that Shannon had, while in foster care:
 "passed certain major developmental landmarks that tell us time is running out, if it has not already run out, for making major caretaking changes. When we view this issue of making changes from the developmental standpoint of the child's needs and capacity to attach, you do not want to wait longer unless circumstances force you to."
The second reason was her developmental history, he stated which he had received from her foster parents. The third reason was:
 "the poor history of her parents, which at that point caused me to be concerned about their future reliability. If I had thought that they were effectively rehabilitated and that there was a good probability of long term sobriety, I would have said so in the report. If that data had been there, it would fulfill one prong of the requirements of reconciliation."
The court has the benefit of that data at this late stage and the parents have effectively rehabilitated themselves as reviewed in detail below. But such an outcome, given the long and "extremely troubled history of the parents, their relapses, their incarcerations, and the distress and disruption in the lives of these children" was what Dr. Mantell reasonably believed would continue, as it had gone on repeatedly in the past. Dr. Mantell found it would have simply been "too hazardous to just reintroduce them . . . until there was a solid sense that the parents were solidly on the road to rehabilitation." He did admit that a parent could not reunify with a child without visitation.
As noted, it was in December, 1998 that visitation again began between Brian, Jr. and his father. Brian was psychiatrically tested on December 29, 1998 by Dr. T. Wayne Downey. He found that Brian was then a "normal well-adjusted school age boy. He has recovered from the previously severe situationally provoked depression of last summer."[15] There was no other evidence presented of further evaluations of the children, either psychological or psychiatric, until those prepared by Dr. Barbara Berkowitz, two years later.
Dr. Berkowitz recommended against termination of Brian's parents' CT Page 11158 rights to him. She felt that for the foreseeable future, he should remain in foster care with Fred and Dawn S. together with his sister, Shannon. Dr. Berkowitz observed in her report "both children seemed comfortable in this home, and their strong bond appeared to warrant their remaining together, for now."[16] She also recommended that Brian's therapy continue and that there should in the future be some family work with his father and the foster family and that at some point in the future, Terrianne might be included. As previously found by the court, such contact has indeed taken place since the day of the report.
In her testimony before the court, Dr. Berkowitz was quite clearly distressed by the fact that Brian, Jr. and his sister would be separated. She testified that "it saddens me that something I do not agree with is happening." She noted that she had written an opinion that Brian, Jr. and Shannon should remain together and not be separated.
In her testimony about reunification efforts between Brian and his father, Dr. Berkowitz spoke of Brian's strong memories and his attachment to his father. She had therefore recommended contact continue between them. She further evaluated the necessary therapeutic supports that would be required for this child to be with his father. The implication of her written evaluation is that Brian would be returned to his father's care, if his father did what was required of him. If reunification between Brian and his son was ultimately successful, then it follows that Brian would, at some point in the future, be separated from his sister. The result before the court, which Dr. Berkowitz testified saddened her, is in part the direct outcome of her series of evaluations and differing recommendations for these two children.
Dr. Berkowitz was unequivocal in her assessment and recommendation that the biological parents' rights to Shannon be terminated. She testified that termination was in Shannon's best interests as this child required permanency. In her opinion, it would be terrible if Shannon were separated from her foster family that had cared for her for over three-quarters of her life. Such a separation is not in Shannon's best interests. She testified that to require Shannon to suffer another significant loss in her life and reattach to her biological parents would be traumatic for her.
Dr. Berkowitz admitted she did not know why there was never any visitation permitted in this case between Shannon and her biological parents, but she knew that DCF had made this decision. She further found that there was no existing parent-child relationship between Brian, Sr. and Shannon, although she, like Dr. Mantell before her, found his interaction with his daughter appropriate. In her report of her evaluation of Shannon, she wrote: CT Page 11159
 "there is no sign of any kind of attachment or relationship between father and daughter. Nor did Shannon show any reluctance to leave at the end or any sadness, as she had with her mother the previous day. . . . She appeared to be ready to leave as quickly as possible."[17]
While as indicated, Dr. Berkowitz recommended termination of the biological parents' rights to Shannon, she did recommend reasonable visitation. She noted:
 "as long as the biological parents can be respectful of the [foster parents'] legal and psychological parenthood, they should be allowed some reasonable visitation. Two or three times per year would be suggested, although the parties may work out the schedule with the help of a mental health professional as a mediator. . . . The [foster parents] need assistance in understanding that positive contact with the D.'s is most likely in the best interest of healthy identity formation for Shannon."
Dr. Berkowitz was questioned about the concerns she had raised about the accuracy of Dawn S.'s reports about Shannon and the impact of those reports on her opinion. She stated that if she had known those reports were exaggerated, it would not have changed the outcome of her evaluation or her recommendations to the court. She stated that the information received from Dawn S. represented less than ten percent of the data on which she relied to form her conclusions. She stated that her profession does not have the knowledge to accurately pinpoint the cause of Shannon's developmental delays, her attachment difficulties and her earlier aggression. Nonetheless, she was very clear that Shannon's foster parents had provided Shannon with the care and stability that Shannon needed after being neglected by her biological parents.
She was questioned about the concern that Dawn S. raised about being alone with Terrianne in her waiting room at the time of the psychological evaluations and the problems which resulted. In her report, Dr. Berkowitz writes:
 ". . . Mrs. S. requested that, when she brought Shannon next week, she not be alone in the waiting area with Terrianne D., because she "has a history of going after me in the past.' This psychologist said that would not be a problem, but that a voice mail CT Page 11160 remainder in a few days would be helpful so that she could insure that this would not happed. It must be noted that Mrs. S. did NOT telephone with such a reminder. Instead, she contacted DCF and precipitated some miscommunications, discord, and distress, all of which was completely unnecessary."[18] (emphasis in original)
When describing the next session, Dr. Berkowitz noted:
 "The session began a few minutes late, as Mrs. S. and Shannon had not arrived on time. This was interesting as Mrs. S had told this psychologist that she would come 15 minutes early in case we were ready to start earlier . . . At the time of the session, the DCF worker, Michael Milano arrived, and said he needed to talk with the evaluator. Mrs. D. was asked to leave the office, where we had just completed her individual evaluation a few minutes prior to the interaction session. Mr. Milano said he and his supervisor had received calls from Mrs. S. indicating distress at being at the evaluator's office with Mrs. D and wanting Mr. Milano there as a buffer. As mentioned above, Mrs. S. had mentioned some concern, but this psychologist had indicated she would take care of it, and had asked the foster mother to remind her via voice mail which was not done. (Although there may be some history of discord between the two women, Mrs. D. would have to be a complete fool to cause a scene of any sort at the court-appointed evaluator's office. Hence, it was unlikely that there was any cause for concern) Mr. Milano clearly did not wish to be there, emphasizing how much work he had to do. He asked if this psychologist thought he needed to stay during the appointment, or could she detain the mother until the foster mother had left. The evaluator said she could do, so he then went to the waiting area with the evaluator, where Shannon and Mrs. S. had arrived a little late. After the session was over and Mrs. D. had left, this psychologist checked with the foster mother who completely denied having called DCF with any such concerns. She said she called about a matter dealing with the pediatrician and that it was Mr. Milano's idea to come to the office building. Since she had expressed significant concern last week, Mrs. S.'s denials were not fully credible."[19]
CT Page 11161
The court concludes from these observations of Dr. Berkowitz that Mrs. S. has in the past and continues to have the potential to cause difficulties for the biological parents in their quest for contact with Shannon. Dr. Berkowtiz [Berkowitz] also found, as she noted in her report quoted above, that both foster parents would need assistance in understanding and supporting such contact.
The court concludes from Dr. Berkowitz's recommendations and her testimony that Dr. Mantell's observation of 1998 remains accurate and a considerable understatement in this case, He had stated "[t]he issue of visitation is quite complex." It also highlights that, some three years after removal of Shannon from her birth parents, in a respected clinical and forensic psychologist's opinion, it remains in Shannon's best interest to have some ongoing contact with her biological parents, even though for the past five years such contact was never permitted by DCF or the court.
Dr. Berkowitz was presented with a significant dilemma in this case. All agree that Brian and Shannon should continue to have some contact, since they are so closely bonded. To sever the relationship between them is not in either child's best interests. Further, if their contact continues to exist in the years to come, Shannon will know the identity of her biological parents, an outcome Dr. Berkowitz directly supports through her recommendation of post-termination parental visitation for Shannon. Through Brian, Jr., whether Shannon lives with her biological parents or not, she will acquire information about them and come to understand that they are her biological parents as well as his. As she gets older, she will perceive and understand some of the emotional reality of their meaning to Brian. She is likely to wonder about why she herself does not reside with them. Further, she is likely to be puzzled by what it is about her that makes her situation different from that of her brother. The court therefore concludes, based on Dr. Berkowitz's consideration of this dilemma, her ancillary findings, as well as the future impact of such contact on Shannon, that Shannon will never have complete permanency, even if her foster parents ultimately adopt her.
This position, albeit in different terms and words, was echoed by the testimony of the guardian ad litem on August 7, 2001. When questioned about why he had changed his position and recommendations regarding Shannon, he listed a number of factors. He stated because Brian had been successfully reunified with his parents, because of the bond between Shannon and Brian and because Jennifer was now visiting in the home with her mother: "it leaves Shannon out of the loop when she starts growing up. She is the odd man out." CT Page 11162
The guardian also expressed concerns about Brian's reports to him that apparently Brian was not permitted, during visitation with Shannon, to leave a gift he brought for her. In addition, he reported recent statements by Brian that Brian had apparently been coached by his foster parents during earlier times of visitation to "act out", so that visitation would end. The guardian also testified to concerns that he had approximately two years earlier in the case, when Brian was still residing with his foster parents and had sent letters to his father. Those letters contained language the guardian did not believe a child of Brian's age would write. It appeared to him that those letters were a result of coaching by his foster parents and Brian confirmed that his foster parents had helped him with those letters.
The guardian was careful to phrase his conclusions as "apparently" and "possible coaching" and other negative influences by the foster parents on Brian concerning contact with his father. The court, too, cannot draw any clear factual conclusions from Brian's statements under these circumstances. Nonetheless, these reports, the information contained in Dr. Berkowitz's evaluation about Dawn S.'s behavior, the court's own conclusions about the accuracy of her reporting about Shannon in the past, her conflict with Terrianne as well as the failure of visitation between the two siblings to occur with the frequency expected, raise the specter of an intentional and planned lack of cooperation by the foster mother and perhaps the foster father. Such behavior does not bode well for future cooperation between all concerned for the benefit of Shannon.
2. The mother, Terrianne D.
Terrianne is now thirty-five years old and a portion of her background and history has already been recounted above. She, like her husband, has a long history of drug addiction and criminal involvement. She, like her husband, is also a convicted felon. Her two older children, Jennifer and Brian, have been repeatedly disappointed by the neglectful care their mother provided and her many relapses. Indeed, Jennifer S., her sixteen year old daughter, testified at trial concerning the events in the home just before the order of temporary custody entered and all three children were placed elsewhere, she with her paternal grandparents. She relayed an early history as a young child of multiple moves and multiple caretakers. Whether or not she testified accurately concerning the lengths of time she was out of her mother's care or the places where they resided was disputed by her mother in Terrianne's own testimony. Nonetheless, regardless of its temporal accuracy, Jennifer's testimony did poignantly reflect her inner reality and childhood experiences as well as her own attempts to impose order and coherence on a chaotic life. She described the many times in 1997 that her mother was not home at night and her own need to care for her younger siblings. CT Page 11163
Jennifer was, as of March 16, 2001, completely estranged from her mother. She reported watching her mother and Brian fighting in the home, as her step-father was abusing drugs, while her mother was still sober. She reported that during this time, Terrianne had a boyfriend, "Tom," who was in the home and who treated the children badly when their mother was not present. Jennifer did not then believe her mother was capable, regardless of any claimed period of sobriety, of caring for her younger half-siblings, to whom Jennifer is very attached. She stated that Shannon and Brian, Jr. should be protected from the kind of life she had led while in the care of her mother.
Despite Jennifer's evident anger at her mother and her own feelings of abandonment, she, as of August 7, 2001, was again visiting with her mother. While the court did not receive any information about the quality of their contact with each other nor Jennifer's motivation for seeking contact with her mother, the court agrees with the guardian that their contact is significant. Jennifer and Terrianne have not had any direct contact in a very long time. Their possible reconciliation further supports the guardian's conclusion that Shannon might well feel left out of the familial contacts her siblings have.
As Terrianne herself admitted, in March, 1997 she succumbed to addiction once again, starting this time by a gambling addiction which brought her very quickly back to drug use and criminal behavior. While her husband was in jail in 1997 for six months, Terrianne had also been arrested and then released. Her whereabouts were unknown to DCF until August, 1997, when Terrianne herself called to ask about seeing her children and what she should do to have them returned to her. At that time, on August 12, 1997, she admitted she had been free of illegal substances for a period of three weeks.
There is some dispute about the exact sequence of DCF's attempts to contact Terrianne or her attempts to contact DCF. Terrianne claims that DCF knew her whereabouts beginning in May, 1997. DCF disputes this. What is known is that on October 15, 1997, Terrianne was again incarcerated and thereafter an inpatient at a substance abuse facility in lieu of incarceration, The court also finds that Terrianne contacted DCF about visitation at the facility, but no visitation was offered. Motions for visitation were also filed on her behalf.
While Terrianne completed her treatment, she again relapsed. She was again arrested and again incarcerated until November, 1998. In early 1999, her process of recovery appears to have taken a turn for the better. She was accepted into the New Haven Drug court program. The director of the program testified on her behalf at trial. Terrianne CT Page 11164 completed the program successfully, not quite a year after her entry, in February, 2000. In that entire time, she did not have any random urine samples taken showing the presence of illegal drugs. She was able to maintain her sobriety for a period of a year. As the director of Project More stated "she would now be in sustained remission, as there were no symptoms to support a diagnosis of drug dependence." He noted that her progress in the program was "exceptionally good." He stated that her involvement in the recovery process and her commitment to the counseling she was receiving were described as excellent repeatedly by her various treatment providers. He noted that Terrianne at that time and since that time has continued to participate in certain grass roots advocacy groups and shared her experiences with others in similar situations in the community. Terrianne's drug counselor also testified and spoke of Terrianne's progress, her rehabilitation and her successful completion of the program. The many program records further document Terrianne's excellent progress.
Terrianne, like Brian, has maintained her sobriety for a period of over two years since early 1999. This, give her past life history, is a considerable achievement, although she has remained sober for this length of time in the past, only to fall prey to drug abuse again. She is to be congratulated and commended for her difficult progress. But, as she herself testified, the disease will always be with her and she must remain vigilant for her lifetime.
Terrianne, like her husband, was given specific steps in order to reunify with Shannon on April 9, 1998. Those steps required her to attend parenting, individual and drug and alcohol counseling, to secure and maintain adequate housing and income, not to engage in substance abuse and to have no further involvement with the criminal justice system. She was not able to accomplish these goals until after January 3, 1999, the day from which she measures her current period of sobriety. But, as the court has previously noted, as of the last day of the presentation of evidence, the court finds that she had completed these satisfactorily. There has been one expectation with which she could not comply, and that is to visit with Shannon as often as permitted, since no visits were ever offered to her by DCF.
Terrianne testified to the animosity over the years between herself and Dawn S. Both she and Brian believe that if the children had been placed with foster parents who were strangers to the family, they would have been reunited with Shannon before now. They both believe that visitation would and should have been permitted early on and that they would have been able to maintain a relationship with their daughter.
3. Shannon D. CT Page 11165
Shannon is now five years old. Her birthday was on April 2001. With the exception of contact with her father when evaluated by Dr. Mantell in 1998 and with her mother and father during the psychological evaluation performed by Dr. Berkowitz, she has not seen either of her biological parents since she was eleven months old. She knows no other parents other than her foster parents, Fred and Dawn S. They have nurtured her and raised her as their own. They are the ones who have provided for her basic needs and given her the structure, care and consistent parenting, which any child requires to thrive and develop. And Shannon has developed and done well in their home. She views her foster parents as her psychological parents. She is closely attached to her brother Brian as well as her older sister, Jennifer. There is no doubt that, from Shannon's point of view, her best interests would be served by remaining with her foster parents, who want very much to adopt her. She was an infant who was preverbal at the time her parents left her life through their own actions and her life has been consistently with her foster parents since that time. The court finds, from the clear and convincing evidence, that looking solely at her best interests and her "interest in sustained growth, development, well being and in the continuity and stability of [her] environment,"[20] remaining with her foster parents would be the best outcome for Shannon.
 C. REASONABLE REUNIFICATION EFFORTS 1. Reasonable Effort Finding.
The statutory provisions of Connecticut General Statute § 17a-112
(now) (p) state:
 "The provisions of this section shall be liberally construed in the best interest of any child for whom a petition under this section is filed."
Such instruction, however, does not permit the court to ignore the other substantive portions of the termination of parental rights statutes which DCF is required to prove. In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent" Connecticut General Statutes § 17a-112 (j)(1). The court cannot find by clear and convincing evidence that the efforts made by DCF were reasonable.
The court does not question that the services to which the parents were referred and in which they participated were reasonable. The question is was it reasonable, under the circumstances of this case, where the CT Page 11166 reunification plan for Shannon was formulated and articulated by DCF with reference to her older sibling, Brian, Jr., to deny visitation between the parents and Shannon? Was it reasonable, once the reunification plans with Brian, Jr. were on a positive track, to then untangle the plans for the siblings and seek termination for Shannon? The court cannot find by the required weight of evidence required that this was so. The court does not find that DCF's efforts were unreasonable, given the psychological difficulties both children were experiencing as well as the lengthy past history of drug abuse by the parents, but that is not the legal determination required.
It is unexplained why there was no visitation permitted at the inception of this case when Brian was released from incarceration in November 1997. The determination that visitation was not to be permitted with Shannon was not made by the Birth-to-Three counselors until after April, 1998 and cannot justify the earlier determination by DCF and others to deny visitation. The implication from the facts on which DFC [DCF] relied to deny visitation is that Shannon's mother so neglected her in the early months of her life, that visitation was not fitting. Such a concern could have been addressed by supervision. Parents are not, in the reunification phase of neglect petitions, punished for earlier neglectful behavior. Second, the court agrees that the past history of drug abuse on the part of Brian and Terrianne did not make rehabilitation in 1997 and 1998 a likely or predictable outcome. Nonetheless, visitation is not therefore counter-indicated until the parents have shown they do not attend visitation regularly or that the children act out in unacceptable ways either during or after the visitation. Even in Brian's case, when Brian did act out after contact with his father, extra therapeutic support was provided to him so that contact could be resumed. No efforts along these lines were ever made for Shannon.
At the outset, the court has found from the evidence that the reports of Shannon's condition at the time of her removal were exaggerated. The court does not doubt that she had stranger anxiety, some developmental delays, was aggressive and difficult to manage. The working hypothesis of DCF to deny visitation in the early months of this matter appears to have been that contact with her mother would traumatize her further. An equally plausible hypothesis is that, for Shannon, the removal from her mother was such a traumatic event that she significantly regressed in those early months. During the time that reunification was DCF's plan, it might have been beneficial to this particular child with her individual temperament to have been permitted properly supervised contact with her mother while incarcerated or in a halfway house. What the outcome might have been will never be known, since visitation never took place. Had such a more reunification-oriented approach been followed, this case and these children would be in very different circumstances than they now CT Page 11167 find themselves. Further, once DCF formulated a joint, undifferentiated plan for both children, it itself brought about the long period of time that Shannon has not seen her parents. DCF's actions brought about the fact that Terrianne and Brian have no ongoing parent-child relationship with Shannon.
There is a confused quality about the records and the testimony concerning the visitation determination early on in this case. It was men that Shannon had the greatest "stranger phobia" about, it was Brian who did not wish to visit with his mother, who had disappointed him yet once again by her drug use as she had in the past. The plan for the children never clearly separated these issues. The children were treated as a homogeneous undifferentiated group, when in fact they are two different children with very different needs.
The confused co-joined quality that permeates this case, the treatment of the children and the issue of visitation, is also apparent in Dr. Berkowitz's evaluation. Her recommendation concludes on the one hand that complete severance of the legal connection between the parents and this child is in the best interests of that child. On the other hand, the evaluation also finds it in the best interests of Shannon to have ongoing contact with her biological parents two or three times a year, even where there is no ongoing parent-child relationship and even where there has been no visitation in over four years.
It is for the foregoing reasons that the court has made its determination regarding reasonable efforts in this case. Having found that DCF has not met its statutory preliminary burden, the court dismisses the petition for termination of the parental rights of Terrianne D. and Brian D. to their daughter, Shannon D.
2. Other Considerations
Having failed to find that the efforts made by DCF in this case toward reunification were proven by clear and convincing evidence, the court's inquiry need not extend further and indeed the court has dismissed the termination petition. Nonetheless, after many days of testimony on the myriad issues raised in this case, there remain a number of further considerations to be addressed. First, given that the parents have consistently requested visitation and have been denied visitation with Shannon, the ground of no ongoing parent-child relationship, brought about by DCF's failure to permit any contact, is not a viable claim. There is evidence through the testimony of Irene P. that both parents were involved with Shannon and had a parental relationship with her prior to her removal from the home. The court has found that both parents sought visitation with their daughter throughout the case. See In reCT Page 11168Valerie D., 223 Conn. 492, 613 A.2d 748 (1992).
By November 23, 1999, the date of the filing of the termination petition, both parents were on the road to rehabilitation, perhaps not fully rehabilitated, but their further rehabilitation was then foreseeable. The court has earlier noted the details of their road to recovery and their determination to be reunited as a family with their children. DCF therefore failed to prove this allegation by clear and convincing evidence.
More troubling in its implications for Shannon, however, is the second aspect of the statutory requirements concerning rehabilitation that the parents:
 "have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child" Connecticut General Statutes § 17a-112 (j). (emphasis added).
Given Shannon's age and needs, in particular her need for stability and continuity of care, regardless of why her parents have not had contact with her in over four years, it is not easy to see how reunification efforts at this late date can be anything but emotionally difficult for her. The only foreseeable outcome that is immediately psychologically beneficial to Shannon is her continuing, legally protected right to have contact with her brother, Brian, Jr.
The competing claims to Shannon D. have resulted in a solomonic contest of biblical proportions with a difficult outcome. Those who have raised Shannon and provided her with care and attention must face her parents, whose addiction prevented them from doing so earlier, but who are now in a position to reestablish contact. If careful attention is not paid to Shannon's needs, the likely outcome is that Shannon will be pulled apart, if not by a sword, then by the competing claims of those who care deeply about her. Each group should be forewarned about the difficulties facing them. Dr. Berkowitz noted in her evaluation:
 "Shannon has been an innocent bystander. . . . and her interests must be considered paramount and in need of protection."
In protecting Shannon's interests, her foster parents must be supportive of the biological parents claims to Shannon as well as her CT Page 11169 need for contact with her brother. They must lay aside their animosity and belief that Terrianne is a "bad" parent who can never improve. Terrianne and Brian must also recognize that, regardless of their strongly held feelings, Shannon now views her foster parents as her parents. Even if reunification is possible with her biological parents, which remains to be determined, Shannon's attachment to her foster parents also deserves recognition and support by her biological parents.
In order to deal with such wrenching significant family issues, Dr. Berkowitz suggested therapeutic supervision of any contact between Terrianne, Brian and their daughter, assuming that such contact could continue post-termination. She also made certain well-supported recommendations, which, with adaptations, form the blueprint for the court's orders.
 D. ORDERS 1. Shannon remains a child committed to the care and custody of DCF, the court having dismissed the termination petition. The court finds, from the evidence, that this is in her best interest. Her commitment continues until May 2, 2002, absent other court orders in the interim.
 2. The court finds that reasonable reunification efforts have not been proven by clear and convincing evidence to have been made. The court directs DCF to provide such reunification efforts now, which are to include visitation between Brian and Terrrianne [Terrianne] D. and Shannon as well as Brian, Jr.
 3. The court orders that visitation be carried out in accordance with the recommendations made by Dr. Berkowitz in her evaluations dated April 24, 2000. Further, the court orders that Dr. Berkowitz function initially as the visitation supervisor, given her extensive knowledge of the case and in order that such contact be established soon.
 4. Dr. Berkowitz, together with DCF, shall coordinate the therapeutic visitation between Shannon and her parents to continue in the foreseeable future. Such visitation ultimately should be conducted by another suitable professional or professionals, not previously involved with Shannon, perhaps those individuals who have been assisting in Brian's CT Page 11170 reunification with his father and now his mother. The court further orders, in accordance with Dr. Berkowitz's recommendations, that a copy of this decision, together with her evaluations in the matter of Shannon D. be released to such professionals for their use.
 5. The court further orders that a permanency plan for Shannon be filed in accordance with this decision and with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session